**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**COMPUTERSHARE TRUST COMPANY N.A. and**
**WISCONSIN & MILWAUKEE HOTEL FUNDING LLC,**

**Appellants,**

**v.** **Case No. 25-C-1984**

**WISCONSIN & MILWAUKEE HOTEL LLC and**
**U.S. TRUSTEE OFFICE OF THE U.S. TRUSTEE,**

**Appellees.**

---

**DECISION AND ORDER AFFIRMING THE ORDER OF**
**THE BANKRUPTCY COURT DENYING LENDERS' MOTION TO LIFT STAY**

---

In this Chapter 11 bankruptcy appeal, Appellants Computershare Trust Company N.A. and Wisconsin & Milwaukee Hotel Funding LLC (Lenders) seek review of a decision of the United States Bankruptcy Court for the Eastern District of Wisconsin, which denied Lenders' motion under 11 U.S.C. § 362(d) to lift the automatic stay with regard to Appellee Wisconsin & Milwaukee Hotel LLC (Debtor). Lenders argue that the bankruptcy court applied the wrong burden of proof and erred in finding that Debtor has shown a reasonable possibility of a successful reorganization within a reasonable time. This court has jurisdiction under 28 U.S.C. § 158(a)(1). Though Lenders make a strong argument that their motion for relief from the stay should have been granted, the issue this court must decide is not whether it would have granted Lenders' motion. The issue is whether the bankruptcy court abused its discretion in denying Lenders' motion. Given that standard of review, Lenders are not entitled to relief. The order denying the stay will therefore be affirmed.

## BACKGROUND

### A. Legal Context

When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the debtor as security. 11 U.S.C. § 362(a). In effect, this provision prevents a lender from foreclosing on property given as security for a debt even though the debtor is in default. The lender in such circumstances can seek relief from the automatic stay under § 362(d). That section reads as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

In *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988), the Court held that creditors who are owed debt in excess of the value of the collateral (undersecured creditors) are not entitled to compensation under § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral. In reaching this conclusion, the Court rejected the argument that the phrase "interest in property," as used in § 362(d)(1), includes the secured party's right to seek immediate possession of the defaulted security and apply it in payment of the debt so as to stop the loss the lender incurs because it is deprived of the use of the

proceeds during the term of the stay. *Id.* at 370–76. To so construe the statute, the Court explained, would mean that an "undersecured creditor's inability to take immediate possession is always 'cause' for conditioning the stay (upon the payment of market rate interest) under § 362(d)(1), since there is, within the meaning of that paragraph, 'lack of adequate protection of an interest in property.'" *Id.* at 374–75. Reading the statute in this way, the Court held, produced a substantive effect that was incompatible with the rest of the law. *Id.* at 371.

The lender in *Timbers* had argued, among other things, that because undersecured creditors are not entitled to post-petition interest on the debt owed them under 11 U.S.C. § 502(b)(2), they "will face inordinate and extortionate delay if they are denied compensation for interest lost during the stay as part of 'adequate protection' under § 362(d)(1)." *Id.* at 375. To this argument, the Court responded that undersecured creditors were to seek relief under § 362(d)(2). "Once the movant under § 362(d)(2) establishes that he is an undersecured creditor," the Court observed, "it is the burden of the debtor to establish that the collateral at issue is 'necessary to an effective reorganization.'" *Id.* "What this requires," the Court explained, "is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*." *Id.* at 375–76. "This means," the Court noted, "as many lower courts, including the *en banc* court in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* at 376. The Court continued, noting that "[t]he cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition." *Id.*

The Bankruptcy Code grants a Chapter 11 debtor the exclusive right to file a plan for reorganization within 120 days after the petition is filed, 11 U.S.C. § 1121(b), suggesting that when

a debtor elects to file under Chapter 11, it has some reorganization plan in mind. The Court recognized in *Timbers* that "while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, *see* 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." *Id.* The Court then cited in two footnotes numerous cases where bankruptcy courts had granted motions for relief from stays under § 362(d)(2) within as much as a year but most within a far shorter time. *Id.* at 376 nn.1–2.

*Timbers* thus stands for the proposition that to protect undersecured creditors from the "inordinate and extortionate delay" they would otherwise face as a result of the denial of compensation for interest lost during the automatic stay, bankruptcy courts are expected to relieve such creditors of § 362(a)'s automatic stay when the debtor fails to show "a reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 376 (citation modified). On the other side of the scale is the general policy underlying Chapter 11: "Chapter 11 . . . embodies the general Code policy of maximizing the value of the bankruptcy estate . . . . Under certain circumstances a . . . debtor's estate will be worth more if reorganized under Chapter 11 than if liquidated under Chapter 7." *In re A & F Enters., Inc. II*, 742 F.3d 763, 768–69 (7th Cir. 2014) (quoting *Toibb v. Radloff*, 501 U.S. 157, 163–64 (1991)). At the same time, Chapter 11 "does not guarantee reorganization nor does it permit an indefinite suspension of creditors' rights and remedies pending the unsuccessful attempts of any party to effect a reorganization of debt." *Matter of Woodbrook Assocs.*, 19 F.3d 312, 322 (7th Cir. 1994) (citation modified). It is in this context that the issue before this court arises.

**B. Procedural History**

Debtor owns and operates the Milwaukee Marriott Downtown (the Hotel). Jackson Street Management (JSM), a hotel development, renovation, and management company, formed Debtor to develop the Hotel. Computershare holds a lien on the Hotel securing debt that far exceed the value of the Hotel ($45 million vs. $26 million). In other words, Computershare is a undersecured creditors. Debtor filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Wisconsin on April 9, 2024, putting an automatic stay in place pursuant to 11 U.S.C. § 362(a). As noted above, under 11 U.S.C. § 1121(b), Debtor had a 120-day exclusivity period beginning at the petition date to file a reorganization plan. Debtor subsequently requested and received two extensions of the exclusivity period, the first for four months and the second for sixty days. Lenders did not object to the first extension, but they did object to the second one, arguing that Debtor had delayed acting in furtherance of its proposed reorganization. The bankruptcy court granted the second extension, "notwithstanding the fact that certainly early on in the case, parties' perceived needs for things like appraisals, that appear, from what's been filed, to have been backburnered . . . ." Dkt. No. 3-5 at 1575.

Debtor filed its First Amended Chapter 11 Plan of Reorganization on February 7, 2025, nearly ten months after the petition for reorganization was filed. On April 4, 2025, almost a year after filing for Reorganization, Debtor refiled the plan and then filed a clean copy on April 10, 2025. A confirmation hearing on the First Amended Plan was scheduled for July 21, 2025. Lenders objected to the April 10 plan on May 21, 2025, and Marriott International, the franchisor, filed a limited objection as well. On May 23, 2025, the bankruptcy court entered an order noting that some matters raised in the objections, such as uncertainty involving future management and

the Marriott franchise agreement, as well as a need to market test the proposed "new value" contribution, "might benefit from preliminary vetting." Dkt. No. 3-1 at 79.

On June 5, 2025, Lenders filed their motion for relief from the automatic stay under 11 U.S.C. § 362(d). Dkt. No. 3-2 at 636. Noting that it was undisputed that their secured claim far exceeded the value of the collateral, Lenders argued that Debtor could not show that there was a reasonable possibility of a successful reorganization within a reasonable time as required by 11 U.S.C. § 362(d)(1). Lenders noted that by the time of the scheduled confirmation hearing, Debtor will have had the protections of Chapter 11 for nearly sixteen months and had yet to present a confirmable plan. In the meantime, Lenders argued, the ongoing delay was damaging them, with no contractually required debt service and mounting administrative expenses.

Bankruptcy Code § 362(e)(1) provides that within thirty days of a request for lift-stay relief under subsection (d), the automatic stay is to be terminated with respect to the moving party unless the court orders it continued "pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section." 11 U.S.C. § 362(e)(1). On June 10, 2025, the bankruptcy court held a status conference. By that time, Debtor had already indicated it was evaluating potential amendments to its April 10 plan. The court ordered that Debtor "file a final amended plan by no later than June 27, 2025," and warned "this is a final plan amendment deadline, and the debtor is not authorized to file any additional amended plans without further leave of the court." Dkt. No. 3-2 at 658. The court also reiterated its previous order that Debtor file and serve any new or revised management and franchise agreements on or before July 11, 2025. *Id.* The court scheduled the final hearing on the motion for relief from the automatic stay at the end of the confirmation hearing, then set for July 21, 2025, through July 25, 2025, with a final pretrial to take place on July 17, 2025.

Debtor submitted a Second Amended Plan on June 27, 2025. It did not file a revised franchise agreement by July 11, 2025, however. On July 16, 2025, Debtor submitted a brief in support of its second amended plan. The following day, the bankruptcy court entered an order noting it had reviewed Debtor's brief and advising Debtor that it should be prepared to address several objections raised by Lenders which were not addressed with "sufficient specificity" in Debtor's brief. Dkt. No. 3-1 at 93. Those objections included the assertion that the plan failed to comply with the absolute priority rule and the refusal to allow Lenders to bid the value of their loans in the proposed equity auction. The court ended its docket entry with the question: "Absent convincing answers to these questions, doesn't controlling precedent and sec. 1129 require the court to deny confirmation of the amended plan?" *Id.* at 94.

At the July 17, 2025, final pretrial conference, Debtor acknowledged that it did not believe the Second Amended Plan could be confirmed and necessarily had to amend the plan. The July 21 hearing, originally scheduled as a confirmation hearing on the First Amended Plan, was converted to a hearing on Lenders' motion to lift the stay. Instead of July 21, 2025, the hearing commenced on July 22 and continued into July 24, at which time the bankruptcy court again shared its thought about why the June 27 plan could not be approved. But the court did not rule on Lenders' motion to lift the stay at that time. Instead, the court ordered Debtor to file its Third Amended Plan by August 5, and continued the hearing on August 6, 11, and 14, 2025. At the conclusion of the hearing on August 14, 2025, Debtor informed the bankruptcy court that it intended to submit a Fourth Amended Plan, its fifth plan overall. Dkt. No. 3-5 at 783. After the hearings, the parties submitted briefs on the issue of whether Lender's motion for relief from the stay should be granted.

Lenders argued in support of their motion under § 362(d)(2) to lift the automatic stay that Debtor had failed to demonstrate "a reasonable possibility of a successful reorganization within a reasonable time," as required by *Timbers*. *See Timbers*, 484 U.S. at 376. They argued that Debtor's Third Amended Plan contained various provisions that did not comply with the requirements of the Bankruptcy Code and therefore precluded confirmation of the plan. In particular, Lenders argued, the plan violated the absolute priority rule of § 1129(b) by providing particular advantages to JSM, the equity holders, with regard to a proposed auction of Debtor's equity and not allowing Lenders to bid their credit in the auction; the plan could not meet § 1129(a)(11)'s "feasibility" requirement because Debtor had not shown that Marriott would enter an extended franchise agreement; and the proposed plan did not comply with § 1129(b)(2)'s requirement that it pay Computershare cramdown interest at a fair and equitable rate determined in accordance with the guidance provided in *Till v. SCS Credit Corp.*, 541 U.S. 465, 483 (2004). Dkt. No. 2 at 5–6.

On December 5, 2025, the bankruptcy court entered a 55-page Opinion and Order denying Lenders' motion to lift the stay, finding that the Hotel was "necessary to an effective reorganization" under 11 U.S.C. § 362(d)(2), and concluding that, while Lenders' objections to the provisions of the plan had some merit, especially regarding the benefits provided to JSM in connection with the proposed auction, none of the supposed defects compromised the plan so as to compel a conclusion that Debtor did not have a reasonable likelihood of a successful reorganization. Opinion at 54. The bankruptcy court reached this conclusion despite the facts that by the time of the hearing on Lenders' motion, Debtor had essentially admitted that it would have to amend its plan yet again, "even though the court [had] set several deadlines in this case ordering the debtor to file a final amended plan, and that the debtor had repeatedly requested leave to further

amend those 'final plans.'" *Id.* at 3. The bankruptcy court nevertheless concluded that "while the end may be near, it is not quite the final curtain." *Id.* at 1.

At the conclusion of its Opinion and Order, the court warned that Debtor should expect the stay to be lifted within a relatively short period of time if Debtor was not able to confirm a plan in the near future:

> Although the court concludes that the Lenders have not demonstrated that the clock has expired on the debtor's time to successfully reorganize, the debtor should recognize that "reasonable time" requires a judgment call—one that a court might justifiably have answered differently under the circumstances presented, including the debtor's continued lack of an extension of the franchise agreement and that at least some of the auction procedures proposed in the amended plan are problematic, if not outright unacceptable. There should be no confusion: if this case is not confirmed "when the flowers start to bloom next spring," *United States v. Warneke*, 199 F.3d 906, 909 (7th Cir. 1999), the court anticipates that the Lenders will have by then been relieved of the § 362(a) stay, either by order or by operation of law.

*Id.* at 54. The court thereupon ordered that the "stay imposed by § 362(a) is modified to terminate upon entry of an order by the court denying confirmation of all plans of reorganization filed or last amended no later than December 31, 2025, *and* the Lenders' subsequent filing of a request that the court enter an order terminating the stay pursuant to this order, accompanied by a proposed order so providing." *Id.* at 55. It is from this order that Lenders appeal.

After issuing its Opinion and Order denying Lenders' motion for stay relief, the bankruptcy court set a schedule under which it extended the deadline for Debtor to file its Fourth Amended Plan to January 12, 2026, with a confirmation hearing to be held on May 26 through May 28. Debtor has filed its Fourth Amended Plan and the scheduled hearing took place. The parties are awaiting the bankruptcy court's decision on whether that plan is approved.

## LEGAL STANDARD

"Because 11 U.S.C. § 362(d) commits the decision of whether to lift the stay to the discretion of the bankruptcy judge, his decision may be overturned only upon a showing of abuse of discretion." *Matter of Boomgarden*, 780 F.2d 657, 660 (7th Cir. 1985) (citing *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 507 (7th Cir. 1982)). This is a high standard. A district court reviews *de novo* the legal conclusions of a bankruptcy court. *In re Newman*, 903 F.2d 1150, 1152 (7th Cir. 1990). The bankruptcy court's factual findings are deferentially reviewed under the "clearly erroneous" standard. A finding of fact is clearly erroneous only when, after considering all the evidence, the reviewing court is "left with the definite and firm conviction that a mistake has been made." *United States v. Dickerson*, 42 F.4th 799, 804 (7th Cir. 2022). "[A] court necessarily abuses its discretion when its decision is based solely on an erroneous conclusion of law," *Colon v. Option One Mortgage Corp.*, 319 F.3d 912, 916 (7th Cir. 2003), when its decision is premised on "a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re KMart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004) (citing *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004)).

## ANALYSIS

Lenders argue that the bankruptcy court abused its discretion by shifting the burden of proof from Debtor to Lenders. Dkt. No. 6 at 24. In support of their argument, Lenders point to the following statement in the bankruptcy court's Opinion and Order: "Still, the court must decide whether the existing record, including the evidence presented on plan feasibility, establishes that the debtor's proposed plan faces insurmountable obstacles to confirmation in the near future . . . ." Opinion at 3. Lenders argue that this standard misstates the test established by *Timbers*, which places the burden on Debtor to show that a plan is likely to succeed; the question is not whether

there are "insurmountable obstacles" to a plan, but whether Debtor has shown that there is a reasonable possibility of a successful reorganization within a reasonable time.

Debtor notes that "[c]ourts have consistently rejected the argument that in opposing stay relief a debtor is under a burden of proving confirmability of a specific pending plan." Dkt. No. 11 at 3. Thus, the fact that its third amended plan was not confirmable, Debtor argues, is not dispositive: "The Lenders' statement of an issue and related argument that the December 5 Order should be reversed because the Third Amended Plan was not proved by the Debtor to be confirmable is therefore incorrect. . . . That is not the law." *Id.* at 4.

But Lenders' argument was not that the stay should be lifted because the Third Amended Plan was not confirmable; their argument was that the stay should be lifted because Debtor had failed to meet its burden of showing a reasonable possibility of a successful reorganization within a reasonable time. That was the issue before the bankruptcy court. After all, *Timbers* held that it was the expectation under § 362(d)(2) that bankruptcy courts would protect undersecured creditors from the loss of interest and administrative costs resulting from "inordinate and extortionate delay" by relieving such creditors of the automatic stay. 484 U.S. at 375–76. Instead of deciding that issue, Lenders contend, the court went about trying to explain that, even though Debtor had not yet, after four attempts and twenty months, presented a confirmable plan of reorganization, it might yet be possible that it could do so. Lenders note that, as *Timbers* pointed out, what the standard requires "is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is *in prospect*." 484 U.S. at 375–76. And the showing required of Debtor is increasingly demanding the further removed the parties are from the exclusivity period Debtor is provided under § 1121(b).

In this case, Lenders contend, they presented substantive objections to the Third Amended Plan proposed by Debtor. Instead of deciding whether Debtor had shown a reasonable possibility of a successful reorganization within a reasonable time that was in prospect, Lenders claim, the bankruptcy court viewed its role as deciding whether Lenders' objections were legally insurmountable. In effect, Lenders argue, the court placed the burden of proof on Lenders to show Debtor could not possibly come up with a plan, instead of requiring Debtor to show that it had a reasonable possibility of a successful reorganization within a reasonable time.

While Lenders' argument is not without merit, especially considering the procedural history recounted above, this court cannot find that the bankruptcy court abused its discretion in denying their motion for stay relief under § 362(d)(2). To be sure, some of the language used in its 55-page Opinion and Order appears to suggest that it was Lenders' burden to show that Debtor could not possibly come up with a confirmable plan, as opposed to Debtor's burden to show that there was one in prospect. The court concludes from its review of the Opinion in its totality, however, that the bankruptcy court properly recognized that the burden on this issue was Debtor's.

At the very outset of its Opinion, the court set out the appropriate standard for deciding a motion seeking stay relief under § 362(d)(2):

> Section 362(d)(2) provides that "the court shall grant relief from the stay provided under subsection (a) of this section . . . (2) with respect to a stay of an act against property . . . , if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Whether the Lenders are entitled to relief under § 362(d)(2) depends solely on whether the hotel is "necessary to an effective reorganization," since the debtor does not dispute that it lacks equity in the property. To show that the property is necessary to an effective reorganization, *the debtor must demonstrate "that the property is essential for an effective reorganization that is in prospect[,] . . . mean[ing] . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"*

Opinion at 2 (italics added) (quoting *Timbers*, 484 U.S. at 375–76). It is thus clear that the bankruptcy court knew which party had the burden and what that burden was.

The Seventh Circuit confronted this same issue in a similar context in *Matter of Woodbrook Associates*, 19 F.3d 312 (7th Cir. 1994). In that case, the debtor, a single-asset partnership, appealed from the bankruptcy court's order granting a creditor's motion to dismiss the debtor's Chapter 11 case. The movant creditor, the United States Department of Housing and Urban Development (HUD), stated it "would not accept Woodbrook's proposed plan or any plan not providing for full payment of its claim." *Id.* at 315. After a hearing, the bankruptcy court ultimately granted the motion and dismissed the bankruptcy case for cause, concluding that "(1) the plan could not be confirmed because it unfairly discriminated among unsecured creditors and violated the absolute priority rule; (2) the plan was not feasible because it relied on the use of funds in which HUD had a lien without HUD's consent; and (3) the proposal of an unconfirmable plan constituted an unreasonable delay and prejudiced the creditors." *Id.* at 316. On appeal, the debtor argued, among other things, that the bankruptcy court erred in placing a burden of proof on Woodbrook, the debtor. The sentence in the ruling on which Woodbrook relied for this argument read: "In the instant case, debtor has not produced sufficient evidence to demonstrate that the interests of the non-HUD creditors are sufficiently unique to warrant separate classification." *Id.* at 317. The court rejected the debtor's argument, explaining:

> This sentence, however, is quoted from the district court's opinion and does not reflect the standard of proof used by the bankruptcy court. Nor does it show that the district court applied the wrong standard of proof on review. Where a motion to dismiss for cause is opposed, the movant bears the burden of proving by a preponderance of the evidence that cause exists for dismissal of the debtor's bankruptcy case. 5 COLLIER ON BANKRUPTCY ¶ 1112.03[2][a], at 1112–16; *Colonial Daytona Ltd. Partnership v. American Sav. of Fla., F.S.B.*, 152 B.R. 996, 1002 (M.D. Fla. 1993). That HUD bears the burden of persuasion, however, does not eviscerate Woodbrook's obligation to produce evidence in opposition to a well-supported motion. Viewed sensibly in the context of the entire opinion, the quoted sentence reflects the district court's view of the sufficiency of the evidence presented at the hearing and HUD's success in persuading the courts that cause for dismissal existed based on Woodbrook's classification scheme. The district court did not err in its placement of the burden of proof or application of standards of review.

*Id.*

The same reasoning applies here. While it was Debtor's burden to show that there was a reasonable possibility of a successful reorganization within a reasonable time, this did not eliminate Lenders' "obligation to produce evidence in opposition to a well-supported motion." *Id.* In fact, that is precisely what occurred over the multiple days of hearings the bankruptcy court held on Lenders' motion. Debtor presented its evidence in the form of its Third Amended Plan and the testimony of its witnesses, and Lenders raised legal objections to various components of the Plan, challenged the testimony of Debtor's witnesses, and offered their own witnesses. The bankruptcy court carefully considered this evidence and the post-hearing briefs of the parties and concluded that, while Lenders' objections to the Third Amended Plan were not without merit, they were not sufficient to overcome Debtor's showing that it had a reasonable possibility of a successful reorganization within a reasonable time. Read in context, the court's use of the phrase "insurmountable obstacles" was its way of saying that Lenders' objections were not sufficient to overcome Debtor's showing. It was a matter of literary style, rather than substance. Likewise, the court's conclusion that "Lenders have not demonstrated that the clock has expired on the debtor's time to successfully reorganize" conveyed the court's conclusion that it was not too late for Debtor to submit a confirmable plan. Opinion at 54. Ultimately, the bankruptcy court concluded: "weighing the evidence presented in the context of whether to now grant the Lenders' request for relief from the § 362(a) stay, the court finds that the evidence demonstrates that the debtor continues to have a reasonable probability of successfully reorganizing." *Id.* The court did not conclude that Lenders failed to meet their burden.

Lenders' remaining arguments go to the length of time the bankruptcy court allowed Debtor to reorganize and the court's rulings on their objections to the Third Amended Plan.

Lenders reasonably complained that after twenty months and four proposed plans, especially given the increased showing the debtor is required to make as the case progresses beyond the four-month period during which the debtor has the exclusive right to submit a plan, their motion for stay relief should have been granted. But while *Timbers* noted that "[t]he cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition," 484 U.S. 376, it did not define what a "reasonable time" within which a confirmable plan must be submitted might be. Nor has the Seventh Circuit or any other court. And as the bankruptcy court noted in its 56-page order denying Lenders' motion to suspend proceedings pending this appeal, while a 2009 study found that the median time to confirmation in Chapter 11 cases was "roughly 14 to 16 months," only about 87 percent of those cases reached confirmation within 24 months. Dkt. No. 18-1 at 36–37. The bankruptcy court further noted that data from this district indicates that "the time from case commencement to plan confirmation has in recent times ranged from four to thirty-three months." *Id.* at 37. Given the absence of any bright-line rule as to what a "reasonable time" might be and the statistics cited by the bankruptcy court, this court cannot say that the bankruptcy court abused its discretion in allowing Debtor additional time to submit a confirmable plan.

As for Lenders' objections to Debtor's Third Amended Plan, the bankruptcy court acknowledged that "there is force to much of this." Opinion at 3 (citing cases where bankruptcy judges were affirmed after having lost "patience" with debtor's delay). Nevertheless, after its careful and lengthy consideration of the objections, the bankruptcy court concluded that those objections, even if correct, did not mean Debtor was unable to submit a confirmable plan within a reasonable time.

For example, the Third Amended Plan included as a central component an auction of Debtor's remaining "equity" in the estate in order to obtain an infusion of cash to complete the repairs and remodeling needed to satisfy Mariott, the franchiser for the hotel. At a high level, Lenders described this component of the Plan as follows:

> the Plan provided that Debtor would conduct an auction of its equity interests to raise the $8 million in financing it needed to complete overdue renovations at the Hotel. (ECF #710, § 5.10(a) [App. 190].) JSM, the equity owner, would act as a stalking horse bidder to make the $8 million bid, and would be entitled to a breakup fee of $280,000 if it did not win. (Id. § 5.10(b)(1)-(2) [App. 190-91].) JSM was also entitled to additional benefits by virtue of its status as equityholder, including automatic "qualified bidder" status (see id. § 5.10(b)(3) [App. 191]), a lower burden of demonstrating financial wherewithal on bid price and renovations (see id.), a lower burden of demonstrating compliance with a Marriott Franchise Agreement (see id. [App. 192]), the absence of a cash deposit subject to forfeiture (see id. § 5.10(b)(9) [App. 194]), and the right to excess sale proceeds before Computershare was paid in full. (See id. § 5.10(b)(11) [App. 194-95].)

Dkt. No. 6 at 15. Lenders claimed that this component of the Plan violated the absolute priority rule.

The absolute priority rule provides that "[c]reditors in bankruptcy are entitled to full payment before equity investors can receive anything." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013) (citing 11 U.S.C. § 1129(b)(2)(B)(ii)). The absolute priority rule applies where a class of impaired creditors objects to the plan of reorganization. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990). Where impaired creditors object to the plan, it can be approved only if it "does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). "[A] plan treats unsecured creditors fairly and equitably if 'the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.'" *Kham & Nate's Shoes No. 2*, 908 F.2d at 1359 (quoting 11 U.S.C. § 1129(b)(2)(B)(ii)).

Lenders argued that the auction envisioned by the Third Amended Plan violated the absolute priority rule in several respects, but most directly because it provided preferential treatment to JSM, Debtor's owner, due to its existing equity interests. The bankruptcy court acknowledged that Debtor's contemplated course of filing a proposed sale motion within 14 days after entry of an order confirming the plan was "problematic," explaining:

> The plan proposes an auction in which JSM is (1) the stalking horse bidder, (2) afforded a $280 thousand breakup fee and other ancillary benefits, and (3) unburdened of the need to demonstrate its ability to pay up to $12.6 million at the auction, a contemplated requirement of any other bidders for the reorganized debtor's equity. ECF No. 760, at 20–21. As a result, the plan's proposed auction is certainly susceptible to a charge that it, and the plan itself, is rigged in JSM's favor, and if it is so rigged, then the plan unquestionably runs afoul of §1129(b)'s fair and equitable requirement.

Opinion at 7. The bankruptcy court also acknowledged that "[a]t least some of the auction terms seem difficult to justify as a means of maximizing competition to buy the new equity." *Id.* at 11. Explaining further, the court noted:

> While slotting the current owner as the stalking horse bidder is plausibly justifiable as avoiding the costs of seeking out another candidate, the plan offers no insight into how the debtor justifies a $280 thousand breakup fee under these circumstances. While breakup fees are a common feature of corporate mergers, those fees are typically justified as a means of compensating the stalking horse for its due-diligence costs on which later participants may free ride, mitigating the disincentive to incur costs in what might be an unsuccessful undertaking and deterring opportunistic bidding.

*Id.* at 8.

Nevertheless, the bankruptcy court rejected Lenders' argument that because these provisions at least arguably violated the absolute priority rule, Debtor could not submit a confirmable plan. The court explained:

> even if the Lenders were correct that inclusion of these provisions offends the absolute priority rule, that conclusion does not mean that the debtor is unable to confirm a plan in a reasonable time. While the plan as drafted contemplates inclusion of these provisions, none of them seem essential to the plan's proposal of

> an equity auction. An equity auction could presumably proceed even if the court approved it on terms that are not identical to those proposed in the third amended plan. In short, sorting out which of the disputed terms, if any, are inconsistent with § 363 or § 1129, or both, is not necessary to conclude, under § 362(d)(2), that the debtors have a reasonable chance of confirming a plan reasonably promptly.

*Id.* at 6. In other words, the bankruptcy court did not hold that the challenged provisions governing the proposed equity auction did not violate the absolute priority rule. It did not decide the legal issue. Instead, the court said that if some of the provisions did violate the absolute priority rule, a plan without those provisions could be approved. While the bankruptcy court's reasoning is certainly challengeable, especially in light of the lengthy procedural history recounted above, this court cannot say the court abused its discretion.

Lenders similarly argue that the bankruptcy court's determination of an appropriate cramdown rate for the payments due on Computershare's secured debt violated the process the Supreme Court had established in *Till v. SCS Credit Corporation*, 541 U.S. 465 (2004). The cramdown rate is the rate of interest the bankruptcy court determines the debtor must pay to a secured creditor to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim. *Id.* at 469. In *Till*, a plurality of the Court adopted what it called the "formula rate" for determining the appropriate interest rate in a Chapter 13 reorganization. The formula adopted by the plurality in *Till* started with the national prime rate, "which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id.* at 479. *Till* states that the bankruptcy court must then adjust the rate to account for the risk of nonpayment posed by borrowers in their financial position: "Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime

rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.*

In this case, the bankruptcy court used the Treasury note rate as the appropriate base or reference interest rate instead of the prime rate. Opinion at 36. Although the treasury rate is generally considered "more appropriate for loans carrying very little risk of non-payment," *In re McCoy*, 657 B.R. 260, 263 (Bankr. N.D. Ill. 2024), Lenders concede it was not error for the bankruptcy court to start with that rate. They note that the total cramdown rate is what matters. Dkt. No. 6 at 50 (citing *In re Topp*, 75 F.4th 959, 963 (8th Cir. 2023) ("We see no legal significance to whether a court starts with a risk-free rate and adds full risk or starts with a some-risk rate and adds some more. If the court properly follows the formula approach, the ultimate discount rate, not the starting point, is what matters."). It is the bankruptcy court's "finding that a 6.8% cramdown rate sufficiently accounted for the risk of default" that Lenders challenge. *See id.*

Lenders argue that the bankruptcy court erred by "fail[ing] to account for the risk-free nature of the Treasury rate it chose as a starting point; it improperly downplayed the high interest rates associated with 100% LTV [loan to value] loans; and it disregarded risk factors that, in its own words, were serious enough to 'result in the court denying confirmation' . . . without carrying that finding to its logical conclusion and finding Debtor's plan patently unconfirmable." *Id.* at 54. But as Debtor points out, the bankruptcy court extensively analyzed the various risk factors in arriving at the 6.8 percent cramdown rate and gave clear reasons for its conclusion. It carefully considered the testimony of Lenders' expert but found her conclusions unsupported and unpersuasive. The hearing it held on the issue is precisely what the *Till* plurality called for to determine the necessary adjustment to the base rate selected by the court: "The court must therefore

hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense." 541 U.S. at 479. While reasonable people can disagree with the bankruptcy court's ultimate finding, it is not clearly erroneous.

As the bankruptcy court has acknowledged, Lenders' frustration is understandable. Computershare is owed $45 million on a hotel that the bankruptcy court has valued at $26 million. It is now two-and-a-half years since Debtor filed for reorganization and roughly one-and-a-half years since it filed its motion for stay relief, during which Lenders have received no interest and have incurred substantial administrative expenses in the form of professional fees in excess of a million dollars. Lenders are now awaiting the bankruptcy court's decision on whether to approve Debtor's fifth proposed plan of reorganization, and this is after the court had warned Debtor that its final deadline for amending its plan was June 27, 2025.

In the final analysis, however, Lenders have not shown that the bankruptcy court abused its discretion in denying their motion for stay relief under § 362(d)(2). Neither the Bankruptcy Code, nor *Timbers*, provides a brightline rule defining what a reasonable time within which the debtor must provide a confirmable reorganization plan or sets a limit on the number of attempts to propose such a plan the debtor should be allowed. Thus, the bankruptcy court did not err as a matter of law in granting additional time and leave to file yet another plan. And while Lenders have raised significant objections to Debtor's Third Amended Plan for reorganization, the bankruptcy court's findings of fact, to the extent it made findings in its assessment of Debtor's Third Amended Plan, are not clearly erroneous. Should the bankruptcy court approve Debtor's Fourth (fifth overall) Amended Plan with provisions similar to those in Debtor's Third Amended

Plan, the objections Lenders have asserted will be ripe for review. At this stage of the proceedings, without a final order approving a reorganization plan, they are not.

## CONCLUSION

For the reasons set forth above, the bankruptcy court's denial of Lenders' motion for relief from the stay is **AFFIRMED**. Lenders' motion to suspend proceedings pending this court's resolution of the appeal (Dkt. No. 18) is **DENIED as moot**. Lastly, pursuant to the notice of non-participation (Dkt. No. 16) provided by the United States Trustee Office, the clerk is directed to remove the United States Trustee as a participant in this appeal and enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 14th day of September, 2026.

William C. Griesbach
United States District Judge